IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

INCLUSIVE COMMUNITIES )
PROJECT, INC., )
    3301 Elm Street )
    Dallas, TX 75226, )
     )
    Plaintiff, )      No.
v. )
     )
U.S. DEPARTMENT OF HOUSING )
AND URBAN DEVELOPMENT, )
    451 7th Street S.W., )
    Washington, DC 20410, )
     )
    Defendant )
_____ )

## COMPLAINT

**Introduction**

1. This lawsuit involves HUD's administration of the federal Housing Choice Voucher (voucher) program that causes voucher families to be unable to obtain appropriate housing. The voucher program pays part of the rent to private landlords agreeing to lease to low-income tenants. HUD has determined that the lack of landlord participation making it difficult for voucher families to find appropriate housing is causing a crisis in the availability of units for voucher families. The difficulties prevent voucher families from accessing low-poverty neighborhoods and the benefits these neighborhoods provide. Despite determining that voucher families have severe difficulty obtaining appropriate housing, HUD refuses to follow the Congressional requirement at 42 U.S.C. § 1437f(q)(2)(B) to assist tenants who have such difficulties by paying fees to housing authorities that would provide voucher families with security deposits, application fees, landlord bonuses, and housing counseling to help them find

1

units. In addition, HUD's arbitrary refusal to follow Congressional requirements set out in the

National Housing Act significantly contributes to the difficulty by departing from the Act's

requirements for market based voucher policies and substituting bureaucratic impediments that

increase the costs and the risks of landlord participation. In order to assist its voucher clients find

housing in low-poverty neighborhoods, the Inclusive Communities Project, Inc. (ICP) has

assumed these costs and risks in order to obtain landlord participation. ICP has suffered

economic injuries in doing so through its sublease program. HUD's failure to provide the

administrative fee funding has injured ICP by causing ICP to spend its own resources in order to

pay security deposits and other financial assistance to obtain landlords with units for ICP

voucher clients, and ICP is now unable to continue to provide this financial assistance. ICP and

the Dallas Housing Authority (DHA) requested HUD action that would have eliminated the

injuries, but HUD denied the relief. The illegal conduct and ICP's related injuries can be

remedied by future injunctive relief.

2. Plaintiff Inclusive Communities Project, Inc. (ICP) is a non-profit organization that

provides financial assistance, unit search assistance, negotiation with landlords, and counseling

for Housing Choice Voucher families seeking to use their vouchers to lease units in

predominantly White non-Hispanic, low poverty, areas with decent, safe, and sanitary housing

and neighborhood conditions.

3. Housing Choice Voucher families need access to the multifamily rental housing in

Dallas metropolitan area White neighborhoods to avoid racial segregation into high poverty,

lower resourced neighborhoods marked by neighborhood conditions inimical to family life.

There are a substantial number of multifamily rental units in the White neighborhoods that are

affordable under the Dallas area voucher rent payment standards. These affordable rental units

are not made available to voucher families because HUD refuses to provide the statutorily required funds to housing authorities necessary to assist voucher families who experience difficulty finding landlords to accept their voucher. The refusal of the multifamily landlords to rent units in White areas is causing voucher families to experience difficulty obtaining appropriate housing under the voucher program. The HUD standard for appropriate housing is housing and neighborhoods that are decent, safe, and sanitary.

4. Congress has directed HUD to pay, through the voucher administrative fees, the costs incurred in assisting families who experience difficulty in obtaining appropriate housing under the programs. 42 U.S.C. § 1437f(q)(2)(B). These administrative fees are in addition to the usual administrative fees for housing authorities for the ongoing costs to administer the voucher program, 42 U.S.C. § 1437f(q)(1). HUD has determined that the lack of landlord participation in the voucher program is causing families to experience difficulty in obtaining appropriate housing under the voucher program. ICP and DHA requested HUD to pay, through the voucher administrative fees, the costs incurred in assisting the families experiencing this difficulty in obtaining appropriate housing. HUD denied the relief. HUD's refusal to pay the requisite fees is arbitrary and capricious and without basis in law. The refusal also violates HUD's obligation to affirmatively further fair housing to provide for housing opportunities for voucher families outside racially segregated areas.

5. ICP is directly injured by HUD's refusal to comply with the statute and provide assistance to the tenants experiencing difficulty obtaining appropriate housing. If HUD paid the statutorily required funds, then ICP would not have had to spend its resources on security deposits and other financial assistance to obtain multifamily units for its voucher clients. Instead, ICP, through its sublease program and through its housing mobility and financial assistance

program is paying the costs required by the difficulty in obtaining appropriate units for voucher families.

**Jurisdiction and venue**

6. This Court has jurisdiction under 28 U.S.C. §§ 1331, and 1343. Plaintiff's claims are pursuant to 5 U.S.C. § § 702, 706. Sovereign immunity is waived by 5 U.S.C. § 702 for the injunctive relief requested in this complaint.

7. The venue is appropriate pursuant to 28 U.S.C. § 1391(b)(1), (2) and 5 U.S.C. § 703.

**Parties**

**Plaintiff ICP**

8. Plaintiff Inclusive Communities Project, Inc. (ICP) is a fair housing focused non-profit organization working with low-income households seeking access to housing in non-Black and non-Hispanic locations in the Dallas area. ICP's office is located in the City of Dallas, Dallas County, Texas.

9. ICP is organized to work for the creation and maintenance of thriving racially and economically inclusive communities, expansion of fair and affordable housing opportunities for low-income families, and redress for policies and practices that perpetuate the harmful effects of racial segregation and other forms of racial discrimination. ICP operates to create and obtain affordable housing in non-Black and non-Hispanic areas within the Dallas metropolitan area for persons eligible for low-income housing including voucher households. This includes, among other means, providing the counseling and other forms of assistance to voucher households seeking to utilize their Housing Choice Voucher to move into those areas.

10. As part of its mission, ICP provides counseling, financial assistance, its sublease program, and other services to Black or African American households participating in the

voucher program administered by the Dallas Housing Authority (DHA). ICP rents units from private landlords and then subleases those units to voucher families.

11. ICP assists voucher families who experience difficulties in obtaining appropriate housing. As of 2019, 85% of the DHA voucher participants are Black or African American according to the U.S. Department of Housing and Urban Development (HUD). ICP assists DHA voucher households who choose to lease dwelling units in non-Black and non-Hispanic areas. ICP's clients are predominantly Black or African American. ICP's clients are predominantly families with children.

12. The units made unavailable by the lack of landlord participation could be used by any voucher household in any city located in the Dallas metropolitan area. The voucher households are not restricted to housing units located within any specific city.

### Defendant HUD

13. Defendant HUD is the executive agency of the United States charged by Congress with the operation of the federal Housing Choice Voucher program.

**I.      HUD finds the lack of landlord participation causes voucher families difficulty in finding appropriate housing**.

14. The voucher program is a federal housing assistance program that helps house 2.2 million low-income households nationally. The voucher program depends on landlord participation to make privately owned units available to voucher holders; therefore, private landlord participation determines the number of available units and their geographic distribution, which in turn affects tenant mobility, healthy housing, and fair housing choice. Because the success of the voucher program depends on the availability of units in the private market, landlords play a pivotal role.

15. HUD states that landlord participation determines how many units are available for

voucher participants, where those units are located, and how well the program achieves goals such as making units available in high-opportunity neighborhoods and alleviating high concentrations of voucher holders in very low-income neighborhoods marked by conditions of slum and blight. HUD research shows that many landlords choose not to accept housing vouchers, threatening the purpose and objectives of the voucher program.

16. HUD has found that the difficulty finding landlords who will accept vouchers causes increases in the cost and duration of voucher housing searches, limits voucher holders' housing and neighborhood options, and increases costs to local public housing authorities (PHAs) and HUD. The HUD sponsored 2018 study "A Pilot Study of Landlord Acceptance of Housing Choice Vouchers" by the Urban Institute shows how difficult it is for a voucher tenant to use a voucher. HUD stated that the researchers of this study found voucher recipients are hard pressed to find a landlord who will accept their vouchers, especially in higher opportunity neighborhoods. One of the five study sites was Ft. Worth where there was a 78% denial rate for acceptance of a voucher by a landlord. The denial rate for acceptance of a voucher by landlords in low poverty areas was higher, 85%.

17. Most multifamily landlords with units available at voucher rents do not accept voucher holders. The participation of more landlords is necessary if the Housing Choice Voucher program is to offer real choice to voucher families. Landlords routinely deny voucher holders, making it difficult for them to use their vouchers and find housing-especially in low-poverty neighborhoods. Voucher holders who want to find housing in an opportunity area- close to high-quality schools, jobs, and transportation- are subjected to higher rejection rates than voucher holders seeking housing in high poverty, low-income areas. This difference in rejection rates is statistically significant. HUD has found that for the voucher program to function efficiently and

fulfill its goal to help vulnerable families reach opportunity-rich neighborhoods, landlord participation must increase, especially in low-poverty neighborhoods.

18. On August 20, 2018, HUD Secretary Ben Carson announced by press release a Department-wide task force to encourage more landlords to participate in the Housing Choice Voucher Program. The reason for the task force was due to two studies being released by HUD. The first study HUD released was of landlord voucher acceptance. HUD states that this 2018 HUD sponsored study conducted by the Urban Institute found voucher recipients are hard pressed to find a landlord who will accept their vouchers, especially in higher opportunity neighborhoods. HUD also announced another study showing that landlords do not participate in the voucher program. HUD also states that the studies find most landlords do not accept voucher-holders, and those who do complain about the program's administrative requirements and housing authorities which manage the program at the local level. The HUD press release states that Secretary Carson established HUD's new Landlord Task Force and announced a number of listening forums across the county to hear directly from landlords on ways to increase their participation in the HCV Program. "These studies tell us that we have a lot of work to do to engage more landlords, so our Housing Choice Voucher Program can offer real choice to the families we serve." HUD has taken no action to increase landlord participation after determining that voucher holders cannot obtain appropriate housing. HUD has taken no action to increase landlord participation despite finding that most landlords do not accept vouchers.

19. The HUD sponsored 2018 study "A Pilot Study of Landlord Acceptance of Housing Choice Vouchers" contains extensive findings on the difficulty voucher tenants face obtaining housing, including the following:

> "As this study shows, finding a landlord willing to rent to a voucher holder can be extremely difficult."

"We learned that finding an available unit, reaching landlords, finding a landlord to accept vouchers, and then meeting with that landlord to view the housing, was extremely difficult. It takes a lot of work to find housing with a voucher. The search requires sifting through numerous advertisements, making numerous calls, and facing frequent rejection. Our study revealed that landlords discriminate against voucher holders at high rates. Voucher holders who want to find housing in an opportunity area-perhaps close to high quality schools, jobs, and transportation-face a higher mountain to climb. They will find landlords in low-poverty areas are less likely to accept vouchers."

"The high denial rates among landlords in Fort Worth," showed that it was one of the sites that had "a high rate of "door slamming," where "voucher holders had difficulty finding units in these locations and landlords to accept their vouchers."

The HUD study finds the voucher tenants' housing search to be "extremely difficult," "arduous," "challenging," and "daunting."

20. HUD has determined that there is a crisis for voucher tenants in the lack of available units for voucher tenants and the lack of landlords willing to accept vouchers. For many years, the national multifamily landlord trade associations have asked HUD to make the operation of the voucher program better align with the leasing market in order to increase landlord participation. HUD refuses to make the changes the landlords assert will increase participation in the voucher program. On February 25, 2020, the National Multifamily Housing Council (NMHC) wrote to HUD asking HUD to halt the HUD regulations and practices that "reduce the effectiveness of the Section 8 programs and reduce broader private sector participation." The NMHC submitted suggestions for specific changes that would "increase the effectiveness of the Section 8 programs by aligning their procedures with private market practices." The concerns of the private landlords specifically include the lack of a standard lease and a lengthy leasing procedure, the lengthy inspection process that delays tenants from obtaining housing, and the failure of the housing authority to timely pay the voucher rents. The landlords assert that these provisions increase the cost for a landlord to participate in the voucher program and deter

participation in the voucher program. All of these requested changes are required by the voucher statute, 42 U.S.C. § 1437f, yet HUD's regulations violate those provisions. See paragraphs 58-67 below. HUD determined that the lack of landlord participation has caused a crisis in the availability of units but has taken no steps to increase landlord participation after making this determination.

21. This lack of landlord participation is not caused by the voucher rents. There are units that are eligible for the voucher program and that lease for gross rents which can be paid with voucher program rent standards. In the Dallas and Fort Worth area at least 40% of the rental units in every Zip Code are eligible for the voucher program based on the rent for the unit.

22.  Many voucher families must either forfeit their vouchers or rent a unit that is not decent, safe, and sanitary in neighborhood conditions. The lack of landlords participating in the voucher program is making the voucher program almost unusable, particularly for obtaining housing in non-Black and in non-Hispanic concentrated neighborhoods.

23. HUD and low-income housing advocacy groups have recommended the adoption of laws prohibiting landlord discrimination against voucher families to increase landlord participation. Texas state law prohibits cities and counties from adopting or enforcing such laws.

**II. HUD refuses to increase the voucher administrative fee to pay for the cost to help the voucher families who experience this HUD caused difficulty renting appropriate housing.**

24. Congress has directed HUD to pay, through the voucher administrative fees, the costs incurred in assisting families who experience difficulty (as determined by the Secretary) in obtaining appropriate housing under the programs. 42 U.S.C. § 1437f(q)(2)(B). The final rule provides that HUD "may approve administrative fees" for the "costs to help families who experience difficulty finding or renting appropriate housing...." 24 CFR § 982.152(a)(1)(ii). The

difficulty obtaining appropriate voucher housing in the Dallas area has been established by HUD. HUD determined that the difficulty in obtaining appropriate housing for voucher holders is even greater in non-Black and non-Hispanic areas. In addition, significant evidence establishing the difficulty of voucher holders obtaining appropriate housing outside of racially segregated areas was presented to the Secretary by ICP and DHA in the 2016 requests for regional mobility funding and financial assistance for security deposits. HUD has determined the difficulty of voucher holders in the Dallas area to obtain appropriate housing but refuses to comply with the statutory requirement to pay additional administrative fees to help the voucher families experiencing this difficulty.

25. The approval of administrative fees for the costs would provide funding to the local housing authority to pay for recruiting landlords including the costs of landlord incentives, assist families with the expenses of relocation, and provide the mobility counseling to help families find and obtain appropriate housing.

26. HUD refused ICP's specific request for the administrative fee funding for DHA to pay the costs to help families who experience difficulty renting appropriate housing.

27. HUD also refused DHA's request on behalf of itself and regional housing authorities in North Texas for additional administrative fees for assisting families to obtain housing outside of racially concentrated areas of poverty. DHA sought the additional fees for the payment of security deposits, application fees, and mobility counseling funds to assist the voucher tenants in finding appropriate housing.

HUD refuses to pay the additional administrative fees even though it has a statutory mandate to pay them. In addition to the administrative fee for the ongoing costs for housing authorities to administer the voucher program in 42 U.S.C. § 1437(q)(1), Congress requires that

the HUD Secretary shall also establish reasonable fees for:

> (B) the costs incurred in assisting families who experience difficulty (as determined by the Secretary) in obtaining appropriate housing under the programs 42 U.S.C. § 1437(q)(2)(B).

28. Each year, Congress appropriates funds for these additional administrative fees under 42 U.S.C. § 1437(q)(2) separately from the ongoing administrative fees of 42 U.S.C. § 1437(q)(1). For example, Congress appropriated $30,000,000 in FY 2018 that could be used for these purposes. P.L. 115-141. The FY 2019 Appropriation Act appropriated $30,000,000 for these additional fees. P.L. 116-6. The FY 2020 Appropriation Act also allocated $30,000,000 for these additional administrative fees. PL 116-94.

29. HUD acknowledges these specially appropriated administrative fee funds in funding notices to the public housing authorities. For example, in 2018 HUD stated:

> The 2018 Act provides $1,760,000,000 for administrative expenses of PHAs administering the voucher program (see Appendix A for Appropriations text). Of the appropriated amount, approximately $1,730,000,000 will be available for ongoing administrative fees and fees for new vouchers and up to $30,000,000 will be made available to allocate to PHAs that need additional funds to administer their Section 8 programs. Notice PIH 2018-09, page 11.

30. The HUD funding notices to the housing authorities do not provide funding for costs incurred by voucher families experiencing difficulties obtaining housing outside of Black and Hispanic concentrated areas. Despite HUD determining that the difficulties in obtaining appropriate housing outside of racially segregated areas is causing a crisis in the availability of units for voucher families, HUD refuses to provide additional administrative fees to alleviate those difficulties and obtain more units for voucher tenants.

**III.   HUD's actions violating the administrative fee statute are arbitrary, capricious, and otherwise not in accordance with law.**

31.  HUD has determined that voucher tenants face extreme difficulty obtaining housing

with their voucher and that the difficulty is more severe in low poverty, non-segregated areas. HUD has determined that most landlords do not accept vouchers. Yet instead of taking action to pay the costs as required by statute, HUD continues to force the voucher families into racially segregated neighborhoods in order to use their voucher. The neighborhoods that have greatest rate of landlord participation in the voucher program have unequal neighborhood conditions that are detrimental to children's well-being. The refusal to pay the additional administrative fee to pay for the financial assistance and mobility counseling that HUD knows will work to address the difficulties voucher tenants face in leasing housing in non-segregated areas is arbitrary and capricious and otherwise not in accordance with the law.

### A. HUD's actions in refusing to pay the additional administrative fees are arbitrary and capricious.

32. Despite the fact that HUD has found that most landlords do not accept vouchers, HUD has done nothing to increase actual landlord participation in the voucher program. HUD refuses to comply with the statute and pay the administrative fees for financial assistance and housing mobility counseling that HUD knows works to provide units for voucher families outside of racially segregated areas.

33. The law requires HUD to establish reasonable administrative fees for the costs incurred in assisting families who experience difficulty in obtaining appropriate housing under the voucher program. 42 U.S.C. § 1437f(q)(2)(B). HUD has determined voucher families are experiencing severe difficulty in obtaining units because of the lack of landlord participation and that the difficulty is even greater in non-Black and non-Hispanic areas. HUD arbitrarily does not provide for these additional administrative fees to be provided to the housing authorities for the voucher families experiencing difficulty in obtaining appropriate housing despite the statutory obligation to do so.

34. HUD's refusal to provide the administrative fees for the voucher tenants to obtain appropriate housing is an arbitrary and capricious barrier to the availability of units in non-racially segregated areas for voucher families. HUD's failure to pay is arbitrary and capricious because HUD has previously implemented the administrative fees to pay for the costs of voucher tenants who had difficulty obtaining housing out of racially segregated areas in remedies to housing desegregation litigation in East Texas and in Dallas. In East Texas, HUD's *Young v. Martinez* Desegregated Housing Opportunity Guide explains that because of the difficulty of Black voucher tenants obtaining desegregated housing, HUD provided the additional administrative fees for use as landlord incentives to participate in the voucher program, and financial assistance such as security deposits, application fees, utility deposits, and moving expenses for the voucher tenants. *Young v. Martinez*, No. P-80-8-CA, (E.D. Tex.), Settlement Stipulation and Order, Doc. No. 772 (October 23, 2003). In Dallas, the additional administrative fees have been used for similar financial assistance and for the payment of mobility counseling for litigation settlement voucher tenants in *Walker v. HUD*, No. 3:85-1210-R, N.D. Tex., Settlement Stipulation and Order, Doc. No. 2123 (March 8, 2001).

### B. HUD's actions in refusing to pay the additional administrative fees are not in accordance with the law.

35. HUD's refusal to pay the requisite administrative fees is not in accordance with the law because the failure to pay violates the specific statutory requirement to pay for the costs for voucher tenants who experience difficulty obtaining appropriate housing. 42 U.S.C. § 1437f(q)(2)(B). HUD has determined that most landlords do not rent to voucher tenants and that it is even harder to locate a unit in a non-segregated area. It is arbitrary and capricious for HUD to not comply with the law and provide for the additional administrative fees for the financial assistance to help voucher tenants obtain appropriate housing.

36. HUD's funding notices to the public housing authorities implementing the congressional appropriation of HUD voucher funding, including the funding for these additional administrative fees, show that HUD does not comply with the law. These HUD notices fail to follow the statute and provide funding for the voucher families experiencing difficulty obtaining housing in non-Black and non-Hispanic areas. The HUD 2019 Notice implementing the voucher funding, and the previous Notices, refer to the additional administrative fees as "special fees" and couch these fees in terms of "Extraordinary costs." However, the "extraordinary costs" provisions refers to a separate section of the statute at 42 U.S.C. § 1437(q)(2)(C)  and is separate and apart from the provision on costs for the difficulty obtaining appropriate housing in at 42 U.S.C. § 1437(q)(2)(B). There is no mention of the requirement to fund the costs associated with the difficulty obtaining housing in the funding notices.

### C. HUD's failure to pay the administrative fee perpetuates racial segregation of the voucher program.

37. There are two separate discriminatory impacts or discriminatory effects caused by HUD's violation of the administrative fee statute, 42 U.S.C. § 1437f(q)(2)(B). One discriminatory impact or effect is the exclusion of the disproportionately Black voucher group from otherwise available units in White, non-Hispanic areas. This impact or effect perpetuates the existing racial concentrations in the locations of voucher families through the nation and in the Dallas area. The other discriminatory impact or effect is the adverse impact or effect making otherwise eligible units unavailable to the disproportionately Black voucher group.

38. HUD's refusal to pay for voucher tenants to obtain appropriate housing perpetuates the exclusion of the disproportionately Black voucher group from otherwise available units in predominantly White, non-Hispanic areas. The failure to provide administrative fees for security deposits, other financial assistance, and housing mobility counseling exacerbates and perpetuates

the racial segregation of the Housing Choice Voucher program tenants. ICP's fifteen-year experience assisting voucher tenants to move to high opportunity areas shows that the financial assistance and mobility counseling are critical to obtaining landlord participation in the voucher program in a non-Black and non-Hispanic areas. The national research shows that mobility assistance works to assist voucher families out of racially segregated areas marked by unequal neighborhood conditions into better resourced areas that are not segregated.

39. The Housing Choice Voucher program is marked by extreme racial concentration of voucher holders in which the race of the voucher holders correlates substantially with the race of the census tract in which the voucher is located. This concentration exists at both the national and in the Dallas area. The concentrations are statistically significant.

40. The 2018 National HUD data based on individual census tract for all tracts in the country shows the racial concentration of the voucher program:

• 78% of White voucher holders are in census tracts that are greater than 50% non-Hispanic White and 77% of Minority voucher holders are in census tracts that are less than 50% White.

41. The 2018 Dallas area HUD data based on individual census tract data for Dallas, Texas Core Based Statistical Area (Dallas CBSA) shows the racial concentration of the voucher program:

• 39% of White voucher holders are in census tracts that are greater than 50% White and

• 82% of Minority voucher holders are in census tracts that are less than 50% White.

42. The majority of all the public housing authorities' vouchers in the Dallas area are in racially concentrated non-White and low-income areas in the City of Dallas.

43. The units made unavailable by HUD's violation of the statute are disproportionately

located in majority White, non-Hispanic Dallas area census tracts. ICP surveyed the private

multifamily landlords in four counties in the Dallas area: Dallas, Denton, Collin, and Rockwell

counties to see if the landlords would rent units to voucher tenants. The surveyor made contact

with the rental offices of 1,901 private multi-family properties. Of the 1,901 properties surveyed

a mere 226 (12% of those surveyed) responded "YES" to accepting Section 8 vouchers. 1,675

(88% of those surveyed) responded "NO" to accepting Section 8 vouchers. There were no

multifamily housing landlords willing to rent to voucher families in 26 majority White non-

Hispanic suburban cities in the Dallas area. In fact, 90% or more of the private multifamily

properties that were surveyed in an additional 10 majority White non-Hispanic suburban cities

answered "No" when asked whether they accepted vouchers.

44. The 2018 City of Dallas North Texas Regional Housing Assessment of Fair Housing

found:

   • An overwhelming majority (87%) of the surveyed landlords do not
   accept vouchers;

   • the surveyed landlords refusing vouchers tend to be disproportionately
   located in neighborhoods with a significantly greater share of white population
   than the City average;

   • As for the surveyed landlords accepting vouchers, they are primarily
   located in census tracts with a significantly greater share of nonwhite population.
   Correspondingly, Voucher families tend to disproportionately reside outside of
   neighborhoods in which the surveyed landlords refuse vouchers.

45. The City of Dallas based its findings on the ICP survey of landlords refusing to rent

to voucher families in the Dallas area. The Assessment of Fair Housing (AFH) is a legal

requirement that the City must complete to continue receiving federal housing and community

development funding from HUD. Specifically, the AFH is an analysis undertaken pursuant to 24

CFR Part 5.152 that includes the analysis of fair housing data, an assessment of housing issues

and contributing factors, and identification of fair housing priorities and goals specific to Dallas.

46. The City of Plano North Texas Fair Housing Assessment found that ninety-six percent of landlords contacted in Plano refused to accept voucher holders. Of the 148 Plano-area landlords surveyed in the study by zip code, only four landlords responded that they would accept vouchers. The City of Plano based its finding on the ICP survey of landlords refusing to rent to voucher families in the Dallas area.

> Inclusive Communities Project conducted a survey of 1,901 multifamily properties from May 2015 through February 2017 in four counties, including 112 properties in Plano, to determine the availability of landlords willing to accept Section 8 vouchers. ICP found that only 12% of landlords overall would accept vouchers. Acceptance rates were lowest in communities with lower rates of minority residents. Ninety-six percent of landlords contacted in Plano refused to accept voucher holders. Figure 60 shows responses from the 148 Plano-area landlords surveyed in the ICP study by zip code. Only two landlords in 75093 and two in 75074 responded that they would accept vouchers. "Landlords refusing to negotiate with or rent to voucher holders causes the perpetuation of racial segregation by excluding a predominantly black voucher population from renting available multifamily units in white non-Hispanic census tracts." (Inclusive Communities Project, 2017).

47. The landlord voucher participation survey adopted in both the City of Dallas and the City of Plano Regional Fair Housing Assessments shows the disproportionate number of multifamily units in White areas that would be available to voucher tenants except for the landlord refusal to participate in the voucher program. The cities of Dallas and Plano found that the landlords' refusal to participate in the voucher program perpetuates racial segregation in the Dallas area. Thousands of units available at Voucher rents are made unavailable because of the lack of landlord participation in the Voucher program.

48. Voucher families of color, particularly Black families, in the nation and in the Dallas metropolitan area are substantially more racially segregated into minority concentrated areas than low-income families who are not receiving the voucher subsidy. In fact, 73% of voucher

assisted families of color are in minority concentrated areas according to HUD data. Only 22%
of White non-Hispanic voucher assisted families are in minority concentrated areas according to
HUD data.

49. According to HUD data, 82% of all Black and Hispanic voucher families are located
in minority concentrated census tracts in the Dallas metropolitan areas. Only 61% of White non-
Hispanic voucher families are located in predominantly minority concentrated census tracts in
the Dallas metropolitan areas according to HUD data. Black and Hispanic voucher families are
more segregated into minority concentrated areas of the Dallas metropolitan area (82%) than
Black and Hispanic voucher families nationwide (73%) according to HUD data.

50. Without the funds to provide the financial assistance for security deposits, landlord
bonuses, other financial assistance, and mobility counseling, voucher tenants are unable to access
available units in non-racially segregated locations.

> **D. The racial concentrations caused by the HUD statutory violation subjects
> the voucher residents in the predominantly minority census tracts to unequal
> conditions.**

51.  HUD's violation of the administrative fee statute is a cause of the extreme unequal
conditions that accompany the racial concentrations of vouchers in the City of Dallas. The racial
concentrations subjects Black voucher tenants to unequal neighborhood living conditions which
are not inflicted upon White non-Hispanic voucher tenants. HUD's statutory violation is a cause
of Black and Hispanic children of voucher families living in the racially concentrated
neighborhoods to be injured by destructive environments totally unknown to most White
Americans. The attendant neighborhood disadvantages to the children's current well-being and
future life chances are the same as if they and their families were being subjected to de jure racial
segregation.

52. These neighborhood conditions in majority Black and Hispanic neighborhoods in Dallas where voucher families can find landlords to participate in the program are unequal. The unequal conditions include high rates of violent crime, schools already impacted by concentrations of low-income students, seriously substandard housing and other structures, missing amenities such as grocery stores and banks, and the pervasive presence of nuisances such as illegal dumping and roaming dogs. The areas lack jobs and have been deprived of public and private investments.

53. Congress recognizes the benefits to children from avoiding these neighborhoods of accumulated disadvantage.

> The HCV program's design is to provide financial assistance to households to enable them to choose the housing and neighborhood that best suits their needs. Evidence underscores that low-income children whose families move from very poor neighborhoods to lower-poverty areas have higher earnings as adults-and are less likely to become single parents and more likely to attend college- than children that remain in less-advantageous neighborhoods. H. Rpt., 115-890, 2d sess. 2018, page 2.

54. Congress also found that

> as currently administered, housing vouchers do not effectively enable families to access neighborhoods with greater opportunities that can help prevent intergenerational poverty. H. Rpt., 115-890, 2d sess. 2018, page 2.

**E. HUD's violation of the administrative fee statute adversely affects a disproportionately Black group - voucher tenants.**

55. HUD's violation of 42 U.S.C. § 1437f(q)(2)(B) denies the disproportionately Black group of voucher tenants the units that the security deposits, landlord bonuses, financial assistance, and mobility counseling required by the administrative fee statute would make available through participating landlords. The Black renters are adversely impacted as compared to White non-Hispanic renters.

56. The 23,744 Black voucher families in the Dallas-Plano-Irving Metropolitan Division are 13% of the total Black renter households in that area. The 2,949 White non-Hispanic voucher households in the Dallas-Plano-Irving Metropolitan Division are 1.1% of the total White non-Hispanic renter households in that area. The percentage of Black voucher households, 13%, is over 12 times the percentage of White voucher households, 1.1%. A Black household is over 12 times as likely to be adversely affected by the challenged HUD policies as a White non-Hispanic household. The disparity is statistically significant.

### F. HUD is increasing the difficulty for voucher tenants to obtain appropriate housing with its additional statutory violations of 42 U.S.C. 1437f that are cited by landlords as reasons not to participate in the voucher program.

57.  There are statutory elements of the voucher program that HUD fails to comply with that would increase landlord participation in the program. HUD's failure to comply with these provisions increases the difficulties that voucher tenants face in obtaining appropriate housing and shows how the failure to pay the additional administrative fees is arbitrary and capricious and not in accordance with the law.

58. HUD violates three specific statutory requirements enacted to obtain higher rates of landlord participation in the voucher program by eliminating bureaucratic barriers. One statute requires voucher leases to be in the standard form used in the locality with terms and conditions that apply generally to tenants who are not assisted under the voucher program. 42 U.S.C. § 1437f(o)(7)(A), (B). Another statute requires the Secretary establish procedural guidelines and performance standards to facilitate inspections of dwelling units and conform such inspections with practices utilized in the private housing market. 42 U.S.C. §1437f(o)(8)(G). Another statute requires each public housing agency to make timely payment of any amounts due to a dwelling unit owner. 42 U.S.C. § 1437f(o)(10)(D).

59. These statutory provisions are the product of the Congressional intent that the voucher program was to provide "a single market-driven program that will assist in making tenant based rental housing assistance more successful at helping low-income families obtain affordable housing and will increase housing choice for low-income families." PL 105-276 (October 21, 1998).

60. HUD has enacted regulations and other administrative guidance that violate the terms of the voucher statute and are cited by landlords as reasons for not participating in the voucher program.

61. The voucher lease required by the voucher statute must be in a standard form used in the locality by the landlord. The lease must be consistent with state and local laws. The terms and conditions of the leases must apply generally to tenants in the property who are not assisted under the voucher program. No other terms are required or allowed. 42 U.S.C. § 1437f(o)(7)(A), (B). HUD violates the statute by requiring a "tenancy addendum" that contains provisions prohibited by the statute. 24 C.F.R. § 982.162.

62. The HUD required, non-market unit inspection practices result in delay and the attendant costs from holding units off the market raised by the landlord trade associations as a reason for the lack of landlord participation since at least 1993. Congress responded to the concerns by amending the Housing Act and requiring HUD to establish guidelines and standards for these inspection practices that facilitate inspections and conform such inspections with practices utilized in the private housing market. 42 U.S.C. §1437f(o)(8)(G). The 1998 revision was clear. HUD was to conform such inspections "with practices utilized in the private housing market." The HUD required inspection process does not conform with practices utilized in the private housing market.

63. The statute requires timely payments. 42 U.S.C. § 1437f(o)(10)(D). HUD's regulation violates the timely payment requirement by giving PHAs up to 60 days to make the initial rental payments. 24 C.F.R. §982.305(c).

64. The national landlord trade associations have represented to Congress and to HUD for many years that eliminating the non-market lease, the non-market inspection process and the failure to timely pay landlords will increase landlord participation in the voucher program. These trade associations assert that the lease addendum, the inspections, and the late payments deviate from the typical market landlord tenant transaction and make it more expensive for a landlord to participate in the voucher program. The associations assert that eliminating these policies will increase landlord participation in the voucher program.

65. The National Multi Housing Council, a national landlord association, has endorsed HUD's use of administrative fee incentives to encourage landlord participation.

66. Congress determined that the statutory obligations would increase landlord participation in the voucher program. Congress enacted these provisions to increase landlord participation in the voucher program. If HUD followed these statutory provisions, then it would eliminate the reasons the landlords have represented cause the lack of multifamily landlords' participation in the voucher program. While these are not the only reasons the landlords have given for the lack of participation in the voucher program, these are reasons that have consistently been raised by the landlords to justify non-participation. Landlord racial discrimination is still a reason for the refusal to participate but is not stated by the landlord associations to be a reason. Compliance with the three statutes is directly under the regulatory control of HUD.

67. HUD has failed to eliminate the regulations and practices that do not comply with the

voucher statute in order to increase landlords who will accept vouchers.

68. The arbitrariness of HUD's lease, inspection, and payment process for the voucher program is further shown by HUD's administration of its Section 8 Project Based Rental Assistance Program (PBRA). The PBRA program is a separate HUD program to obtain private landlord participation in the rental of units to low-income tenants. The PBRA program does not require or use the three-way lease, a lengthy third-party initial inspection process, or delays in payment. The HUD PBRA program pays $12 billion a year to private landlords willing to rent to low-income tenants. The program serves 1.2 million low-income families. The initial inspection process is a walk through the units by the family and a landlord representative. The only subsequent inspections are made of only a sample of the units and are conducted at intervals of a year or more. 24 C.F.R. § 886.123(b), (c).

69. Not only has HUD not taken any action to get more landlords for voucher tenants, HUD actions administering the voucher program actually make it more unlikely that landlords will participate in the voucher program. The multifamily landlord trade associations have informed HUD and Congress that the lease that contains non-market terms, the lengthy inspection process, and the failure to allow timely payment of the voucher subsidy for the rent increase the costs associated with the voucher program. By failing to provide a standard market lease, a market inspection process and timely payment of rent, HUD has increased the lack of landlord participation in the voucher program with these violations of the voucher statute, the National Housing Act, 42 U.S.C. § 1437f.

70. HUD admits the lack of landlord participation makes it difficult for voucher households to find appropriate housing nationally and in the Dallas area. ICP and DHA requested the additional administrative fees to pay the costs of finding appropriate housing in the

Dallas area. HUD refused the requested relief in violation of the terms of the statute. 42 U.S.C. § 1437f(q)(2)(B).

71.  HUD's violation of the statute is arbitrary, capricious, otherwise not in accordance with law, and short of a statutory right pursuant to 5 U.S.C. § 706(2).

### IV. Final Agency Actions by HUD

72. ICP requested that HUD provide administrative fee funding to pay the costs to overcome the difficulty in obtaining appropriate housing. The request was made by a letter dated May 13, 2016. HUD refused to provide any of the relief requested in the May 13, 2016 letter.

73. The Dallas Housing Authority made a June 16, 2016 request on behalf of itself and other regional housing authorities for additional administrative fees to provide financial assistance with security deposits and a regional housing mobility program for voucher tenants to obtain housing outside of racially segregated locations. The other housing authorities joining in the request were for the cities of Plano, Fort Worth, Greenville, Denton, Cleburne, Arlington, Granbury, and McKinney, and for the Tarrant County Housing Agency. DHA made another request for the administrative fee relief on August 9, 2016. HUD denied both of DHA's requests.

74. HUD's withholding of the administrative fees for the local housing authorities for the financial assistance for voucher tenants is final agency action in violation of the law. The withholding of these fees provides for judicial review of HUD's actions pursuant to the APA, 5 U.S.C. § 702. Agency action is defined to include an agency "sanction." 5 U.S.C. § 551(13). The APA defines "sanction" as including an agency's "withholding of relief." 5 U.S.C.A. § 551 (10)(B). Relief is defined as the "grant of money, assistance . . . or remedy." 5 U.S.C.A. § 551 (11)(A). HUD has determined that the voucher tenants face extreme difficulty obtaining housing in the Dallas area. The requirements for the provision of the additional administrative fees under

the law, 42 U.S.C. § 1437f(q)(2)(B) are met, yet HUD continues to withhold the financial assistance which is the relief provided by law in these conditions.

75. HUD's denial of the relief sought by ICP and DHA is final agency action. There is no other adequate remedy other than a remedy against HUD because HUD is the administrator of the voucher program and sets the rules, regulations, notices, and guidance for the voucher program. HUD controls the housing authorities' implementation of the voucher program through the funding and the enforcement of the HUD rules for the program. The additional administrative fees cannot be obtained by the local housing authorities. Only HUD has the statutory duty to provide those fees.

76. In addition, HUD's notices on the implementation of the funding from the Appropriations Acts and additional administrative fees is final agency action. Legal consequences flow from these notices. HUD's notices concerning failure to provide for additional administrative fees for the cost of the voucher tenants trying to access non-segregated housing is contrary to the statute because HUD is required to pay such costs, 42 U.S.C. § 1437f(q)(2)(B). HUD, as the issuing agency for the notices, acted in excess of its statutory authority in promulgating them.

**V. HUD has not considered the effects of the failure to pay the administrative fees on the legacy of racial segregation in violation of its own Fair Housing Act duty to affirmatively further fair housing.**

77.  The housing voucher program is racially segregated with unequal neighborhood conditions in the locations where Black voucher families are concentrated. The racial segregation and unequal conditions exist at the national level and in the Dallas area.

78. The HUD notices adopting the challenged policy in violation of the statute requiring the provision of additional administrative fees for the costs of tenants experiencing difficulties

that HUD has determined show that HUD did not:

> consider and assess the impacts of the policies on the legacy of racial segregation in the voucher program;

> consider and assess the impacts of the policies on the racial and ethnic concentration of assisted units in the voucher program;

> consider and assess the existence of unequal conditions for Black and Hispanic voucher households; or

> consider and assess the existence of unequal access for Black and Hispanic vouchers to housing opportunities in the voucher program.

79.  HUD has not taken any action to consider and assess the impact of the challenged policies on the racial concentrations and unequal conditions in the voucher program since it adopted the challenged policies.

80.  HUD denied ICP's and DHA's request for the use of administrative fees to eliminate the costs of the difficulties obtaining appropriate housing for voucher families and did not:

> consider and assess the impacts of the policies on the legacy of racial segregation in the voucher program;

> consider and assess the impacts of the decisions on the racial and ethnic concentration of assisted units in the voucher program;

> consider and assess the existence of unequal conditions for Black and Hispanic voucher households; or

> consider and assess the existence of unequal access for Black and Hispanic vouchers to housing opportunities in the voucher program.

81. HUD is in violation of its own obligation to affirmatively further fair housing, 42 U.S.C. § 3608(e)(5) by the failure to address the effects of racial segregation in the voucher program on the difficulties voucher tenants have in obtaining units in non-Black and non-Hispanic areas. The Administrative Procedure Act, 5 U.S.C. § 702 provides the waiver of sovereign immunity for HUD's violation of 42 U.S.C. § 3608(e)(5). Plaintiff seeks judicial

26

review of this final agency action taken in violation of 42 U.S.C. § 3608(e)(5) pursuant to 5
U.S.C. § 706(2).

**VI. ICP has been injured by HUD's refusal to provide the funding to allow voucher
tenants to obtain appropriate, non-segregated housing.**

82. ICP's mission is directly connected to the provision of racially integrated housing
opportunities and the elimination of racial segregation. The creation of racially integrated
housing opportunities and the elimination of racial segregation are purposes of the Fair Housing
Act, 42 U.S.C. § 3601.

83. ICP has a close, essentially representative relationship with its clients. It acts as their
agent in locating integrated rental housing and negotiating housing terms. ICP acts as the clients'
representative in advocacy involving individual matters with the housing authority. It also acts as
the clients' representatives in advocacy involving institutional issues such as the amount of the
fair market rent that can be paid in the Voucher program. ICP is an integral part of its clients'
exercise of their housing-related protections under the civil rights laws. ICP's actions assisting its
clients in obtaining racially integrated housing is within the zone of interests of the Fair Housing
Act, 42 U.S.C. § 3608(e)(5).

**VII. ICP injuries are traceable to the statutory violation and are redressable by
injunctive relief requiring HUD compliance with the statute.**

    **A.  HUD's statutory violation causes increased ICP costs in the provision
       of mobility assistance to ICP's clients.**

84. The housing mobility assistance given by ICP to DHA voucher participants begins
with providing mobility counseling information to the voucher participants as they attend DHA's
mandatory voucher briefings. After the briefings, ICP provides additional mobility assistance as
requested by the households who want to make and sustain a move to a high opportunity area.
This help includes pre-move mobility counseling and related financial assistance when it is

available. The housing mobility assistance also includes negotiating with landlords as necessary to obtain units in the eligible areas at rents that are affordable by the voucher households and eligible for the voucher subsidy. The financial assistance ICP has provided in the past to these households includes the payment of application fees and security deposits to assist households moving into housing that provides opportunities in non-Black and non-Hispanic, low poverty concentrated areas. ICP has also made landlord incentive bonus payments to landlords in areas that provide housing opportunities in non-Black and non-Hispanic, low poverty concentrated areas who agree to participate in DHA's voucher program. ICP has made these payments when it determined that such incentives were necessary to secure housing for the voucher households. For example, ICP has provided a reasonable bonus payment to a landlord necessary to obtain a rent concession in order for a unit to be eligible for voucher assistance at a rent affordable to the family or if the bonus payment is necessary to convince a landlord to participate in DHA's voucher program.

85. ICP's resources have been significantly depleted since ICP asked HUD in 2016 to provide the additional administrative fees to provide the financial assistance and mobility counseling for voucher tenants that is necessary for voucher tenants to obtain housing outside of racially concentrated areas. HUD's refusal to get appropriate housing units for voucher tenants has meant that ICP has had to expend its resources to obtain appropriate housing for its voucher clients. HUD's refusal to pay the administrative fees in 2016 increased ICP's economic injury.

86. Dallas area landlords' refusal to participate in the voucher program is causing a crisis in availability of units for voucher tenants. For example, in 2017 DHA briefed approximately 3,300 voucher holders. Of those, 2,097 told ICP that they were interested in a mobility move. Of the 2,097, only 1,349 families were able to find a unit with a willing landlord that met the

program requirements and use their voucher to obtain housing. Only 433 families who were interested in a mobility move located units in majority White non-Hispanic census tracts while 916 of those interested were only able to locate units in predominantly Black and Hispanic census tracts. But 36%, 748, of the families interested in a mobility move were not able to use their voucher at all and lost the voucher.

87.  ICP has clients who meet the landlords' specific screening requirements but who are rejected because of their use of the voucher.

88. ICP's counselors contact landlords, property managers, and apartment complexes to inquire if they accept voucher families. The description of the process by one of the ICP counselors describes the process. ICP keeps a list of complexes that are located within non-Black and Hispanic concentrated areas and accept DHA vouchers. The ICP counselors add complexes to the list as they come to our attention and use this as a referral tool for their clients. However, many times landlords are not willing to accept the voucher. The counselors have offered the DHA and ICP landlord bonus programs when available but this does not often change their minds. Landlords have a pre-conceived mindset about what to expect from DHA and the voucher program. It is a constant battle to overcome this. ICP's clients call numerous complexes, individual landlords, property managers and realtors. They are faced with rejection at every turn. Some realtor or websites try to charge them a fee for their services. Many landlords cut the conversation short once they hear that renting to the client will involve participating in the voucher program.

89. The description by one ICP client of her difficulties finding a landlord to accept her DHA voucher is illustrative of the problems described by the statistics. She and her four children were currently using her voucher in a rat infested two-bedroom unit located in a high crime area

with frequent nearby gunshots. The rats had eaten through the hoses to the washer and dryer. Her

children had witnessed fights, gunshots, and discrimination which keep them from playing

outside. When she was issued a new voucher in order to move she contacted more than 25

landlords who refused to consider her as a tenant solely because of the voucher and without

consideration of her ability to meet their tenant criteria. The few suitable units she was finding

with a willing landlord either did not satisfy the HUD required inspection process or the landlord

required additional side payments. She stated:

> Long story short I only have 90 days to find a place and time is running out. I am
> stuck between staying in a scary environment or losing my voucher because of
> not being able to find a safe home!!

90. ICP was able to obtain a unit for this client only by paying a higher security deposit

than that required by multifamily landlords who refuse to accept vouchers. The deposit ICP

provided was $1,000. The deposits for multifamily units are between $100 and $500.

91. ICP's ability to assist its voucher clients in obtaining dwellings in non-Black and non-

Hispanic concentrated areas is obstructed by HUD's policy of refusing to pay for the additional

costs of obtaining appropriate housing for voucher tenants in violation of the statute. For each

unit made unavailable by HUD's refusal to provide financial assistance for voucher holders, ICP

must use additional time and financial resources to find another unit for its voucher clients.

92. Given the widespread refusal to rent to voucher households by multifamily landlords,

the available units are disproportionately single family units. The rents paid by the tenants and

the security deposits paid by ICP to obtain these units are higher than the rents and security

deposits for multifamily units. The average security deposit for multifamily units obtained for

ICP clients in 50% or greater White non-Hispanic census tracts was $393 in 2017. The average

security deposit for single family units obtained for ICP clients in 50% or greater White non-

Hispanic census tracts is $1,336 in 2017.

93. If ICP and the voucher client are unable to obtain a unit in a non-racially segregated, better resourced area, then the household will have to seek housing in racially concentrated neighborhoods of high poverty that are generally marked by substantially unequal conditions. When the voucher client is unable to obtain a unit outside of the racially concentrated areas of high poverty, ICP's resources for the mobility counseling efforts on behalf of the voucher client have been expended without furthering ICP's racial integration and desegregation purposes.

> **B. ICP's sublease program obtains units by ICP contracting with landlords for ICP to assume the costs and burdens caused by HUD's statutory violation.**

94. The ICP sublease program provides units for voucher tenants. The costs incurred for the sublease program are necessary because of HUD's actions refusing to provide for landlord participation in the voucher program. ICP' sublease program provides alternative lease and payment contractual terms that assume the costs imposed by HUD's administration of the voucher program by contracting directly with the landlord for the rental unit which ICP then subleases to a voucher family. This program is based on the corporate rental model used by many multifamily landlords. In that model, corporations lease units in the corporations' name and then sublease or otherwise contract with employees to reside in the units. The ICP sublease program is able to pay the rent for its units. The Small Area Fair Market Rents (SAFMR) or Zip Code rents that can be paid in the voucher program are adequate to pay the market rents being charged for a significant number of the available multifamily units in Dallas are non-Black and non-Hispanic concentrated areas. In addition to these units, there is a subset of approximately 2,500 DHA vouchers that are eligible for rents calculated at 125% of the relevant SAFMR.

95. The ICP sublease program offers financial incentives to be paid to participating

landlords in an amount equal to one month's rent. This amount is meant to provide a financial reason to participate. ICP then rents the units pursuant to the landlord's usual form leases and related agreements but with the right to sublease to voucher families that meet the landlords' tenant selection criteria on credit history, rental history, criminal record checks, and other legitimate criteria. ICP then enters into the relevant voucher subsidy agreements including the HUD required lease addendum and the housing assistance payment contract addendum with the housing authority in order to make the sublease satisfy the voucher program requirements. In addition, ICP assumes the obligation to make timely rent payments during the delays caused by the housing authority inspection process and other bureaucratic functions. ICP uses its own funds to make the appropriate payments to the landlords on a timely basis. ICP incurs the costs of the delayed inspections and payments, not the landlord.

96. The sublease program assumes the costs that are imposed by HUD's refusal to comply with the voucher statute requirement for a market lease, market inspection, and timely payment of the rent. ICP has had to expend its resources to obtain units for voucher clients in this manner because of HUD's refusal to take action to provide for units for voucher tenants.

## C. ICP is injured by HUD's refusal to pay the costs incurred in assisting families to obtain appropriate housing.

97. ICP is injured by HUD's refusal to pay, through the voucher administrative fees, the costs incurred in assisting families who experience difficulty in obtaining appropriate housing under the programs. 42 U.S.C. § 1437f(q)(2)(B). HUD denied the relief requested by ICP. Had HUD provided the amounts requested by DHA for inclusion in the administrative fees, ICP's clients would have been able to use those funds to obtain the housing. This would have reduced the amount of the costs paid by ICP for those clients to obtain appropriate housing. DHA requested and HUD denied $6.8 million for the entire Dallas region of which $1.8 million would

have been provided to DHA. The future provision of the administrative fees will reduce the amount of the future costs paid by ICP for its clients to obtain appropriate housing.

### D. ICP injuries are redressable by injunctive relief requiring HUD compliance with the statutes.

98. ICP has helped over four thousand voucher families move into non-Black and non-Hispanic neighborhoods in the Dallas area over the past fifteen years. The results achieved by the financial assistance provided by ICP and ICP's housing mobility counseling show that the provision of mobility financial assistance works to obtain landlord participation and get units for voucher tenants in non-racially segregated locations.

99.  Most of DHA's voucher clients moving during 2015-2018 did not receive any form of mobility financial assistance. Only 5%, (477) of these voucher families moved to locations in non-Black and non-Hispanic census tracts. The remainder, 9,782 voucher families, moved to locations in predominantly minority census tracts using HUD's definitions. Of those voucher families moving to predominantly minority tracts, 2,226 of those families moved to census tracts of extreme poverty with rates 40% or greater of the population below poverty. Only 3% of DHA voucher holders without any financial assistance were able to move to census tracts with less than 10% poverty.

100. ICP is not able to provide financial assistance to all of the voucher tenants who want to move. The demand for the assistance by voucher tenants is great.

101. The court ordered use of the administrative fees for the costs of obtaining appropriate housing for vouchers in other cases shows that the use of the fees works to alleviate the difficulty in obtaining appropriate housing. The difficulty voucher families experience in obtaining appropriate housing outside of high poverty, low-income, racially and ethnically concentrated areas marked by conditions of slum and blight is decreased or eliminated with the

use of the fees. This has been the result of several court ordered remedial efforts funded in the past by HUD in Baltimore, Chicago, Dallas, and East Texas. HUD's payment of the legally required fees would allow the Dallas area PHAs to take the administrative actions necessary for an effective mobility assistance program. These actions include the recruitment of landlords with units in non-Black and non-Hispanic areas and payment of the costs necessary for the participation of landlords in those areas. HUD's payment of the administrative fees would end the use of ICP's funds to pay the costs necessary to overcome the difficulties in obtaining appropriate housing for voucher families in non-Black, non-Hispanic and low poverty areas.

**VIII. Claims for relief**

102.  HUD's violation of the obligation to pay the costs for the difficulties in obtaining appropriate housing for voucher families under 42 U.S.C. § 1437f(q)(2)(B) is arbitrary, capricious, otherwise not in accordance with law, and in excess of statutory authority or short of statutory right.

103.  HUD's violation of the obligation to pay the costs for the difficulties in obtaining appropriate housing for voucher families violates HUD's own obligation to affirmatively further fair housing in violation of 42 U.S.C. § 3608(e)(5).

**IX. Prayer for relief**

A. Plaintiff requests the following relief:

A. a judgment setting aside the challenged funding notices that fail to provide for administrative fees for the difficulties for voucher tenants to obtain appropriate housing as arbitrary, capricious, otherwise not in accordance with law, in excess of statutory authority or short of statutory right;

B. an injunction requiring HUD to pay the future costs for the difficulties in obtaining

34

appropriate housing for voucher families caused by the lack of landlord participation in the voucher program. These costs include the financial assistance necessary to obtain landlord participation in the voucher program and the mobility counseling assistance for the voucher families disadvantaged by the difficulties in obtaining appropriate housing because of the lack of landlord participation in the voucher program;

C. An injunction requiring HUD to come up with a plan for eliminating barriers to the participation of landlords in the voucher program and increase units for voucher tenants, particularly in non-Black and non-Hispanic areas where the difficulty obtaining housing is the greatest;

D. an injunction requiring HUD to comply with its affirmatively further housing obligation in eliminating the difficulties in obtaining appropriate housing for voucher families in the Dallas metropolitan area.

Respectfully submitted,

/s/ Laura B. Beshara
Laura B. Beshara
State Bar No. 02261750
DANIEL & BESHARA, P.C
3301 Elm Street
Dallas, Texas 75226-1637
214-939-9230
Fax 214-741-3596
E-mail: laurabeshara@swbell.net
D.C. Bar No. TX0171
Attorney for Plaintiff

Michael M. Daniel
State Bar No. 05360500
DANIEL & BESHARA, P.C.
3301 Elm Street
Dallas, Texas 75226-1637
214-939-9230
Fax 214-741-3596
E-mail: daniel.michael@att.net
D.C. Bar No. TX0172
Attorney for Plaintiff